629 So.2d 582 (1993)
Charles Vernon BLAND
v.
Frances Elaine Mims Bounds BLAND.
No. 91-CA-1157.
Supreme Court of Mississippi.
December 9, 1993.
*584 Jerry L. DeLaughter, Brookhaven, for appellant.
Joseph A. Fernald, Jr., Brookhaven, for appellee.
Before PRATHER, P.J., and BANKS and McRAE, JJ.
PRATHER, Presiding Justice, for the Court:

I. INTRODUCTION AND PROCEDURAL HISTORY
This appeal from a decision of the Copiah County Chancery Court questions the chancellor's determination of various matters incident to the grant of divorce. Appellee Elaine Mims Bounds Bland ("Elaine") initially filed a complaint for divorce alleging irreconcilable differences. Appellant Charles Vernon Bland ("Charles") cross-claimed for divorce on the ground of habitual cruel and inhuman treatment. Elaine thereafter amended her complaint, seeking a divorce on the ground of habitual cruel and inhuman treatment, and seeking monetary and property settlements and medical insurance coverage for herself. Charles denied Elaine was entitled to the relief sought.
One day before the scheduled trial, the parties entered into a consent agreement for a divorce on the ground of irreconcilable differences, leaving the issues of property division, attorney fees, alimony, and insurance to the court. Following a hearing on these matters, the chancellor awarded Elaine use, possession, and title to the automobile, certain personal property items, medical insurance coverage to be provided by Charles until her present pre-existing health condition no longer exists, Charles to pay certain outstanding medical bills, lump sum alimony of $15,000.00, and attorney fees of $2,500.00.[1]
Charles thereafter filed a motion for new trial on the grounds of witness tampering and unfair and prejudicial conduct; Elaine responded with a motion to strike. Charles' motion for new trial was denied by the chancellor after a hearing. Charles subsequently perfected an appeal to this Court, requesting review of the following issues:
1. Whether the chancellor abused his discretion in denying Appellant's motion for a new trial;
2. Whether the chancellor was manifestly wrong and committed reversible error in awarding lump sum alimony to Appellee;
3. Whether the chancellor was manifestly wrong and committed reversible error in awarding attorney fees to Appellee;

*585 4. Whether the chancellor abused his discretion and committed reversible error by mandatorily enjoining Appellant to maintain Appellee as a beneficiary on his health insurance policy and by mandatorily enjoining Appellant to pay all insurance premiums necessary to afford complete coverage to Appellee;

5. Whether the chancellor was manifestly wrong and committed reversible error in awarding Appellant's automobile to Appellee and ordering Appellant to transfer title to Appellee; and
6. Whether the chancellor was manifestly wrong and committed reversible error in the division of personal property between Appellee and Appellant.
For the reasons discussed herein, this Court affirms the chancellor's denial of the motion for new trial, award of lump sum alimony, attorney fees, possession and title of the automobile, and division of personal property. The order regarding health insurance is reversed and remanded to the Chancery Court of Copiah County.

II. FACTS
Francis Elaine Mims Bounds Bland was once employed at a pawn shop, with the expectation of a fifty percent (50%) ownership in the business after three years of "sweat equity." She quit this job, at Charles Vernon Bland's request, after she had invested a little over a year's time in it and married Charles Bland on October 19, 1986. The couple moved into a house Charles had built just prior to their marriage.
Although Elaine owned two automobiles at the time of her marriage to Charles, the day after the wedding, he insisted upon buying her a Mercury Marquis. After receiving the Marquis, Elaine sold both of her cars. Elaine alone drove this car during the marriage, except when the couple went out together. Charles contended that he never intended to give the Mercury to Elaine because he had lost one car to a previous wife and did not want that to happen again. For this reason, he titled the car in his name only. Charles charged Elaine with stealing this automobile after the parties separated, although that charge was subsequently dismissed.
Charles had a bulldozer business at the time of the marriage. Elaine first claimed her only involvement with this business was running errands, but she later stated that she did whatever an "employee" would have done and assisted in keeping the books beginning in 1987 or 1988, continuing until the time of the separation in February, 1991. Elaine never received any compensation for her work in the bulldozer business. However, Elaine testified that Charles paid for certain personal items for the couple with checks from the business account. Charles testified that Elaine never did anything connected with the dozer business.
During the course of the marriage, the couple started several business ventures: a tree planting service, venetian blind business, and interior decorating/custom design business. Neither Elaine nor Charles were paid any wages from any of these endeavors. Elaine thought all of the businesses were joint ventures with her and Charles as joint owners. There was conflicting testimony regarding which businesses' profits financed other businesses, which business accounts paid for what expenses, and who deposited money into which accounts.
Elaine testified, as did other witnesses, that she had done much of the physical labor involved in the tree planting business from 1987 until she went to work for Royal Maid in June, 1990. Charles agreed that Elaine had helped in this business. Elaine considered the tree planting business hers because she did most of the work while Charles was busy with his bulldozer business.
The venetian blind business, according to Elaine, was begun because Charles had some cash he wanted to filter into a business; Elaine investigated and determined there was a need for such a business. Charles claimed this business was instigated by Elaine and a Mr. C.O. Mathis, but that he (Charles) and Elaine were the only stockholders. Elaine owned 25% of the shares. Contrary to her previous testimony, Elaine claimed that she was not a partner nor did she own any percentage of the venetian blind corporation. The venetian blind business did not flourish, and it had ceased operations in *586 February, 1990, before the parties separated. The company showed a loss of $12,127.00 for 1989.
Elaine's interior decorating business was apparently not a going concern for any substantial period of time. She sewed draperies, bedspreads, and dust ruffles. Elaine began working at Royal Maid, the substation Mississippi Industries for the Blind, as director of public relations in June, 1990, and was still in that position at the time of the divorce. She nets $1,100.00 monthly at Royal Maid.
The couple filed joint tax returns in 1987, 1988, and 1989. The couple's adjusted gross income was $6,633.21 in 1987; $9,199.00 in 1989. In 1988 only Profit or Loss From Business forms (Schedule C) were filed, reflecting a net profit of $12,016.89 for Bland Custom Tree Planting, a net loss of $698.18 for Custom Interiors, and a net profit of $10,066.61 for Bland Dozer Service. Charles claimed the $12,016.80 from the tree planting business went to Elaine via the joint tree planting account. In 1990, Charles individually filed a return for the venetian blind business, which showed a total loss of $5,290.00 for that year. The venetian blind business' S Corporation form showed a loss of $7,053.00. Elaine filed a separate return in 1990.
Elaine was in good health at the time of the marriage, but at the time of divorce she suffered an ulcer and was preparing to undergo a double mastectomy for breast cancer. Her employer-provided medical insurance did not cover her cancer. Elaine had been added to Charles' insurance in May of 1990. The monthly premiums for Elaine's coverage were $127.00 as of the time of trial and $160.00 one year later. The insurance coverage on Elaine provided by Charles was to cover the mastectomy, but Elaine claimed she was unable to pay the $1,000.00 deductible. The Blands separated on February 27, 1991.

III. ANALYSIS

A. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL.
Whether to grant a motion for a new trial is a decision left largely to the trial court's discretion. Muhammad v. Muhammad, 622 So.2d 1239, 1250 (Miss. 1993) (citing Burnham v. Tabb, 508 So.2d 1072, 1075 (Miss. 1987)). A trial judge's denial of a motion for new trial will be reversed by this Court only when that denial evidences an abuse of the trial judge's discretion. Muhammad, 622 So.2d at 1250 (citing Bobby Kitchens v. Mississippi Insurance Guaranty Association, 560 So.2d 129, 132 (Miss. 1989)); Maxwell v. Illinois Central Gulf R.R., 513 So.2d 901, 908 (Miss. 1987); Burnham, 508 So.2d at 1075).
Charles' motion for new trial was based on allegations of witness tampering by Elaine during the divorce trial. He claims that one of Elaine's friends and one of her relatives periodically left the courtroom to speak to sequestered witnesses who were waiting to testify. This violation of the sequestration rule, according to Charles, resulted in prejudice to him and deprived him of a fair and impartial trial. Elaine points out that although Charles presented six witnesses in support of his motion for new trial, none offered proof that any conversation between Elaine's friend or relative and the waiting witnesses concerned testimony offered at trial.
The purpose of "the rule" (M.R.E. 615) is "to discourage and expose falsification, inaccuracy, and collusion in witnesses' testimony." Moffett v. State, 540 So.2d 1313, 1317 (Miss. 1989). Even if the rule was violated in the case sub judice, and there is no clear evidence that it was, it can not be said that Charles was prejudiced as a result. Elaine's witnesses basically testified that she had worked in the tree planting business; Charles' testimony was in accord. There being no proof of collusion in the witnesses' testimony, the chancellor did not abuse his discretion in denying Charles' motion for new trial based on violation of the rule.

STANDARD OF REVIEW FOR ISSUES B  F
This Court will reverse a chancellor only when he is manifestly wrong. Hans v. *587 Hans, 482 So.2d 1117, 1119 (Miss. 1986). The chancellor's findings will not be disturbed unless he was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Faries v. Faries, 607 So.2d 1204, 1208 (Miss. 1992); Tinnin v. First United Bank of Miss., 570 So.2d 1193, 1194 (Miss. 1990). Especially in the divorce arena, the chancellor's findings will not be reversed unless manifestly wrong. Tilley v. Tilley, 610 So.2d 348, 351 (Miss. 1992).

B. WHETHER THE CHANCELLOR WAS MANIFESTLY WRONG AND COMMITTED REVERSIBLE ERROR IN AWARDING LUMP SUM ALIMONY TO APPELLEE.
The four factors to be considered in awarding lump sum alimony were set forth in Cheatham v. Cheatham, 537 So.2d 435 (Miss. 1988): substantial contribution to accumulation of wealth by quitting a job or assisting in the husband's business; a long marriage; separate income or separate estate in comparison to that of the payor; and financial security without any lump sum alimony. Id. at 438. Most important of these factors is a comparison of the estates. Id.
Charles attacks the chancellor's award of lump sum alimony because no financial statements were offered at trial and because Elaine fails the Cheatham test. Elaine responds that the chancellor may excuse presentation of financial statements pursuant to Uniform Chancery Court Rule 8.05 and that he had before him sufficient financial information on which to base a decision. Elaine further argues that Cheatham does not apply to this case because it governs only large awards of lump sum alimony.
It is true that Uniform Chancery Court Rule 8.05 requires each party to a "domestic case involving economic issues" to provide a detailed financial statement to the court. It is also true that the court may, pursuant to Rule 8.05, excuse such a requirement. As the chancellor indeed made an award of lump sum alimony and did not mention on the record the lack of financial statements, it can be assumed that the requirement of such financial statements was properly excused in this case. See Pace v. Owens, 511 So.2d 489, 492 (Miss. 1987) (when no specific findings of fact, this Court assumes the trial court made factual determinations sufficient to support its judgment). Moreover, Charles did not object to the lack of financial statements at trial, nor did he raise this issue in his motion for new trial.
Charles claims his net worth would be greater were it not for Elaine's losing business ventures. Elaine argues that her work contributed to Charles' accumulation of wealth. Charles drove a pick-up truck; Elaine was awarded the Mercury Marquis. Charles also owned a home and the land on which it is situated. Charles had a bulldozer business which is apparently still a going concern and which showed a net profit of $12,300.00 in 1989, two years prior to the divorce. The tree planting business had alternately been shown as Charles', then as Elaine's business. It appears that most of the couple's expenses were paid from the tree planting account. The tree planting business' net profit in 1989 was $4,140.00. The venetian blind business lost $12,127.00 in 1989 and was no longer in existence. Elaine's custom design business was no longer in existence.
The IRS at one time found the couple had overstated their expenses or under-reported their income by about $50,000.00. Elaine netted $1,100.00 a month from her job at Royal Maid. She evidently owned some land, the mineral rights to which she has leased. Elaine also owned an acre of land and a house thereon. No evidence was presented regarding any other investments, debts, or incomes of the parties.
Although the chancellor's opinion does not cite Cheatham, it appears that he relied, at least in part, on the Cheatham factors in making the award of lump sum alimony. Elaine's contention that Cheatham does not apply to a small award of lump sum alimony such as that at issue here is correct. Cheatham, 537 So.2d at 438. This Court said in Gray v. Gray, 562 So.2d 79, 83 (Miss. 1990), that the amount of alimony "should be reasonable ... commensurate with the wife's accustomed standard of living, minus her own resources, and considering the ability of *588 the husband to pay." Both parties should be allowed "to maintain a `decent standard of living.'" Monroe v. Monroe, 612 So.2d 353, 357 (Miss. 1992).
The chancellor's finding regarding the lump sum alimony was that Elaine had abandoned a good job with a future of owning an interest in the business in order to marry Charles. Elaine was described as industrious and hard-working, doing jobs that might have been considered by some people to be "man's work." She was found by the chancellor to have made a significant contribution to the profits of the tree planting business, as evidenced by the purchase, with tree planting profits, of two $10,000.00 certificates of deposit in two years.
Based on this record, this Court holds the chancellor's award of $15,000.00 lump sum alimony to be reasonable and, therefore, this Court affirms.

C. WHETHER THE CHANCELLOR WAS MANIFESTLY WRONG AND COMMITTED REVERSIBLE ERROR IN AWARDING ATTORNEY FEES TO APPELLEE.
Charles simply argues that Elaine is financially able to pay her attorney fees, therefore the chancellor erred. Elaine claims she is unable to pay her attorney fees and that she testified to this inability at trial. Regarding the award of attorney fees for representation through the divorce hearing, Elaine testified that she was unable to pay her attorney the $1,000.00 balance on the $2,500.00 fee. Although the record does not reveal what expenses Elaine must pay from her net salary of $1,100.00 a month, and does not provide details on the value of her mineral rights or any other income or investments she may have, the chancellor apparently found Elaine's testimony credible enough to support an award of attorney fees in the amount of $1,000.00. Given the chancellor's discretion in awarding attorney fees and his sole authority to determine witness credibility [Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987)], this award is affirmed.
Additionally, the chancellor awarded Elaine $600.00 in attorney fees for defending Charles' motion for new trial seeking alteration of the court's decree. Elaine argues that since Charles forced her to defend the witness tampering issue, seeking without justification an alteration of the court's decree, he should pay her attorney fees. In support of this proposition, Elaine cites Owen v. Gerity, 422 So.2d 284, 289 (Miss. 1982) (despite appellant's ability to pay, appellee's post-divorce action had required appellant to hire attorney, therefore appellee should pay attorney fee). Charles failed in his attempt to prove witness tampering. Consequently, as this Court has affirmed the chancellor's denial of Charles' motion for new trial, the award of $600.00 in attorney fees is also affirmed.

D. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION AND COMMITTED REVERSIBLE ERROR BY REQUIRING APPELLANT TO MAINTAIN APPELLEE AS A BENEFICIARY ON HIS HEALTH INSURANCE POLICY AND BY REQUIRING APPELLANT TO PAY ALL INSURANCE PREMIUMS NECESSARY TO AFFORD COMPLETE COVERAGE TO APPELLEE.
Elaine requested medical and hospital insurance coverage. The chancellor found that Elaine had a serious pre-existing condition that resulted in a double mastectomy. Since the medical condition was in existence prior to Elaine's employment at Royal Maid, her new employer-provided insurance would not defray expenses for this pre-existing condition. However, the chancellor found that the Charles' existing policy, of which she was a beneficiary, would cover "at least some of the medical expenses." Under those circumstances, the chancellor found that
it would be unconscionable not to require the defendant to keep coverage in force and pay the premium thereon and therefore, the defendant [was] mandatorily enjoined to keep and maintain the present coverage and continue to pay full premiums, which includes $127.00 or $128.00 that is required to keep this policy in force for the Plaintiff's benefit and to continue to do that until such time as this pre-existing condition no longer exists and Mrs. Bland *589 will have coverage through her employment.
The chancellor's order to provide Elaine the continuance of benefits under Charles' policy "until such time as the pre-existing condition no longer exists," contemplates that after full recovery from the double mastectomy, and when that condition no longer exists, Charles' obligation for medical insurance will end. This Court interprets this order to mean that Charles must continue to provide insurance benefits for Elaine's pre-existing condition only.
Generally, health insurance policies cover a spouse and dependents; however, once a divorce is granted, a former spouse is usually no longer insurable on the other spouse's policy. In reviewing the issue of insurance as it applies to this case, one must remember that insurance is purchased for a future claim or illness which might prove financially devastating. Generally, if the event or illness insured against occurs within the coverage period, the benefits under the policy become vested. One need not pay any further premiums to continue to receive benefits for that particular illness. However, if one wished to secure protection against some other illness or injury, then payment of premiums would have to continue. Benefits vested under the policy as a result of an illness or injury covered by the policy should continue until one of three events occurs: (1) the insured recovers; (2) the insured dies; or (3) benefits under the plan are exhausted. Benefits vest under a casualty policy when the event occurs, i.e., when the collision occurs in an automobile liability, uninsured motorist, medical pay, or comprehensive policy. Likewise, under a health policy, once the illness or injury occurs, those benefits attributable to that particular injury or illness are vested.
This Court addressed this issue in Brown v. Blue Cross & Blue Shield of Miss., 427 So.2d 139 (Miss. 1983). Brown and his wife were insured under his employer's group policy. They waited until the policy provision of time allowing maternity benefits to be covered had elapsed and conceived a child during the policy period. During the term of her pregnancy, Brown's employer terminated its employee group coverage without notification to the Browns. The child was born after the cancellation of the policy. Blue Cross denied benefits, claiming that there was no maternity contract in existence at the time of birth. This Court denied upholding the cancellation on public policy grounds. In effect, this Court held that the maternity benefits had vested at the time the child was conceived, due to the fact that Mr. and Mrs. Brown had a reasonable expectation of coverage. This Court quoted from Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 Harv.L.Rev. 961, 967 (1970), which defined the reasonable expectation doctrine under an insurance contract as follows:
The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.
Further, in Gulf Guar. Life Ins. Co. v. Kelley, 389 So.2d 920 (Miss. 1980), Kelley procured a credit life insurance certificate through a Lucedale bank, and approximately three days later, suffered a heart attack. Gulf Guaranty learned of the attack some two weeks later and cancelled the insurance certificate under the contract. The contract gave Gulf Guaranty the absolute right to cancel a certificate at any time within ninety days from the date of the issuance of the certificate. This Court, however, held that Gulf Guaranty was estopped from cancelling the coverage as a matter of public policy. The Gulf Guaranty Court stated:
Defendant argues that it had the absolute right under the terms of its master policy to cancel the certificate of insurance issued to Kelley within 90 days from the date of issue. Ordinarily, this defense would be upheld; however, in this case the onset of Kelley's fatal illness occurred after the policy was in effect and continued without remission until his death. Considerations of public policy persuade us that, exercise by the insurer of its right to cancel should not be permitted after the onset of a fatal illness and death therefrom, upon the ground of estoppel. In Volume 3A of Appelman's *590 Insurance Law and Practice, § 1813, the author states:
And where the company has accepted the premium on a policy and the insured has relied on its protection, the company is estopped to cancel the policy after the insured has reached such a physical condition that he cannot obtain desirable insurance on his life in any reputable company. [Mutual Benefit Life Ins. Co. v. Robison, C.A. Iowa 1893, 54 F. 580, 598].
389 So.2d at 922.
In a case originating in Mississippi, the Fifth Circuit in Pitts v. American Security Life Insurance Co., 931 F.2d 351 (5th Cir.1991), held that the benefits guaranteed during the lifetime of the policy vested after the illness was incurred during the policy period. American Security had paid in excess of $250,000.00, when it sought to increase premiums in a conscious effort to force cancellation of the policy. The Fifth Circuit held that even though Pitts was unable to pay the increased premiums, he was still able to receive the benefits already vested for the particular illness. The Fifth Circuit affirmed the lower court's decision which held that the vested benefits in Pitts did not require him to pay any additional premiums. Insurance does not vest, but benefits do, upon the happening of the insured event, whether or not additional premiums are paid. The Fifth Circuit held:
The district court cogently summarized the reasons that Pitts should prevail: (1) Pitts had a reasonable expectation of continued benefits; (2) the entitlement of benefits vested at the time of the injury, which was before American Security decided to cancel the policy; (3) the total disability resulting from the accident precluded Pitts from obtaining other coverage; and (4) Pitts was innocent of any wrongdoing. See Brown v. Blue Cross Blue Shield, Inc., 427 So.2d 139, 141 (Miss. 1983); Gulf Guar. Life Ins. Co. v. Kelley, 389 So.2d 920, 922 (Miss. 1980); Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 Harv.L.Rev. 961, 967 (1970).
931 F.2d at 356.
As she was insured under Charles' policy and diagnosed with breast cancer during the policy period, it appears that Elaine's benefits for this particular illness or injury have vested. If so, her benefits will remain vested until such time as she either recovers, dies, or the benefits are exhausted. It is not necessary for Charles to continue paying her premiums, since he is not required to continue to provide insurance for other illnesses which might occur. While it would be unconscionable to leave Elaine without insurance coverage for her condition, which is not the case, it is likewise unconscionable to require the impossible of Charles, i.e., to maintain a former spouse as a dependent on his current insurance policy in contemplation of future illness.
This Court reverses and renders this provision of the chancellor's order and holds that Charles should not be subject to contempt for non-compliance with the portion of the chancellor's decree which requires him to continue to pay premiums for Elaine's insurance.

E. WHETHER THE CHANCELLOR WAS MANIFESTLY WRONG AND COMMITTED REVERSIBLE ERROR IN AWARDING APPELLANT'S AUTOMOBILE TO APPELLEE AND ORDERING APPELLANT TO TRANSFER TITLE TO APPELLEE.
The chancellor found that Charles intended to make a gift of the Mercury Marquis to Elaine, therefore the automobile was awarded to Elaine at the time of the divorce. Charles argues that he had purposely kept the car titled in only his name because he had previously lost a car in a divorce and did not want that to happen again. As further evidence that he did not intend to give the car to Elaine, Charles notes that he charged Elaine with stealing the car when the parties separated. Elaine claims the car was a gift to her the day after the parties married. She had sole use and possession of the car for the duration of the marriage, except when the couple went out together for dinner. Charles evidently did not protest when Elaine sold both of the automobiles she had brought to the marriage.
*591 Despite the fact that the Marquis was titled in only Charles' name, the chancellor's determination that the car was a gift to Elaine is supported by substantial evidence. "If a gift, [Elaine is] surely entitled to the unfettered ownership, possession and use of the automobile." Holleman v. Holleman, 527 So.2d 90, 95 (Miss. 1988). This Court affirms on this issue.

F. WHETHER THE CHANCELLOR WAS MANIFESTLY WRONG AND COMMITTED REVERSIBLE ERROR IN THE DIVISION OF PERSONAL PROPERTY BETWEEN APPELLEE AND APPELLANT.
It appears that Charles' point of contention regarding the division of personal property is that he did not receive a rice bed, an armoire, and two night stands, all of which he purchased during the course of the marriage. Elaine is satisfied with the chancellor's division of the parties' personal property. Charles cites no authority in support of his proposition that the chancellor erred on this matter, therefore this Court is precluded from addressing this issue on appeal. Century 21 v. Corson, 612 So.2d 359, 370 (Miss. 1992) (citing R.C. Petroleum, Inc. v. Hernandez, 555 So.2d 1017, 1023 (Miss. 1990)).

IV. CONCLUSION
The chancellor did not abuse his discretion in denying Charles' motion for a new trial. Charles' motion was based on allegations of witness tampering by Elaine during the divorce trial, in violation of M.R.E. 615. Charles failed to prove violation of the rule.
The chancellor's award of $15,000.00 lump sum alimony is reasonable, supported by substantial evidence, and is, therefore, affirmed.
The chancellor did not abuse his discretion in awarding attorney fees to Elaine for representation during the divorce and at motion for a new trial. Elaine testified that she was unable to pay the balance due on her attorney fee and the chancellor found this testimony credible.
The chancellor erred in requiring Charles to pay health insurance premiums on Elaine "until her pre-existing condition no longer exists and is covered by her employer-provided policy." As Elaine was diagnosed with breast cancer while she was insured under Charles' policy, her benefits for this particular illness have vested. These benefits will remain vested until Elaine recovers, dies, or until all benefits for this condition are exhausted. It is not necessary for Charles to continue paying her premiums since he is not required to provide insurance for Elaine in contemplation of future illness. The portion of the chancellor's order requiring Charles to continue paying Elaine's insurance premiums is reversed.
The chancellor did not err in awarding Elaine the 1986 Mercury Marquis. The chancellor's finding that the car was a gift from Charles to Elaine is supported by substantial credible evidence. It follows that Elaine is entitled to sole use, possession, and title to the car.
Charles failed to cite any authority in support of his contention that the chancellor erred in the division of personal property, therefore this Court is precluded from addressing this issue on appeal.
JUDGMENT IS AFFIRMED IN PART; REVERSED AND RENDERED IN PART.
HAWKINS, C.J., SULLIVAN, PITTMAN, BANKS, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
DAN M. LEE, P.J., concurs in results only.
NOTES
[1] As Elaine had already paid $1,500.00 in attorney fees, Charles was only required to pay $1,000.00.