BARNES, J.,
for the Court:
¶ 1. The Chancery Court of Clarke County approved Shannon and Andrew Arrington’s consent to a divorce based on irreconcilable differences. Andrew agreed to pay $656 per month in child support for the couple’s two children. Shannon received possession of the marital home and responsibility for paying the mortgage. The chancery court awarded Shannon rehabilitative alimony in the amount of $450 per month for forty-eight months. Andrew appeals the chancery court’s judgment. Finding no error, we affirm.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. Andrew and Shannon were married in December 1995 in Heidelberg, Mississippi. Their first son was born in October 1995. In December 1997, Andrew fathered an illegitimate child from an extramarital affair. Shannon, however, forgave Andrew; and in June 2000, their second son was born.
¶ 3. Andrew has been employed as a truck driver for Clarkco Oil Field Service since 2005. For several years the couple enjoyed a measure of financial comfort-Andrew’s income was over $100,000 in 2007 and 2008. He also did extra work for Hayes Petroleum from 2006 until 2008. For several years the family’s finances allowed them to improve their marital home, purchase multiple vehicles, and take regular vacations. Shannon has been employed full-time as a coil helper at Howard Industries since 2005. Her net income, at $1,772.28 per month, is considerably less than Andrew’s. However, near the end of 2008, the Arringtons suffered financial difficulties. Andrew’s hours were reduced, and subsequently, tension increased in the marriage. In 2009, Andrew was still not making as much money as he was prior to 2008, but the situation was improving. At the time of the hearing, his actual gross income was $5,817.61 per month.
¶ 4. In November 2008, Shannon discovered an e-mail where Andrew professed his love to a new female companion. Additionally, Andrew’s mobile telephone records (which were introduced at trial) showed that in January and February 2009, there were approximately 200 telephone calls between Andrew and this other woman. Not surprisingly, in February 2009, Andrew and Shannon separated.
¶ 5. Andrew filed for a divorce based on habitual, cruel and inhuman treatment at the end of January 2009. He requested to *163 receive possession of the marital home and its furnishings and alimony, among other things. Shannon, in turn, filed a complaint for legal separation and separate maintenance, accusing Andrew of uncondoned adultery. She requested custody of the children, child support, and possession of the marital home.
¶ 6. In June 2009, Shannon hired a private investigator to conduct surveillance on Andrew. Shannon and her private investigator caught Andrew and the other woman together in a vehicle at a rendezvous point after a card party at approximately 1:00 a.m. Shannon claims this intervention interrupted Andrew’s opportunity to fulfill his adulterous inclinations. After this encounter, in July 2009, the chancery court granted Shannon permission to amend her complaint of separate maintenance to one of divorce on the grounds of uncondoned adultery and habitual, cruel and inhuman treatment or, in the alternative, irreconcilable differences.
¶ 7. Despite both parties’ fault-based complaints, on October 14, 2009, before trial, Andrew and Shannon executed a consent to divorce on the ground of irreconcilable differences. The parties agreed that Shannon would have primary custody of the minor children, and Andrew would pay Shannon $656 per month in child support. They also agreed that Shannon would receive ownership of the house and pay its mortgage. Andrew was ordered to provide health insurance for the children, and Shannon was ordered to provide dental insurance for the children. Each party would be allowed to claim one child for tax purposes. The remaining contested issues between the parties were whether Andrew would pay Shannon alimony and her attorney’s fees and whether Andrew would be awarded part of the parties’ real property for his sister’s benefit.[1]
¶ 8. At the outset of the hearing, the chancery court accepted and approved the parties’ consent to divorce and all other agreed upon matters. The court also heard testimony on the remaining contested matters and issued an opinion on October 21, 2009. Regarding Andrew’s adulterous behavior, the chancellor noted that under Mississippi law, Shannon’s forgiveness of Andrew’s first adulterous affair and the resulting birth of a child “was conditioned upon Andrew’s continued good behavior.” However, the chancery court found this initial affair showed Andrew had an adulterous disposition. Then, the chancellor noted that, in November 2008, Andrew “professed [his] love and affection” for a new female companion, and he “put himself in at least one situation where he and she were together in circumstances where his adulterous disposition could be carried out.” Therefore, the chancellor found that Andrew’s behavior could “support a finding that, circumstantially, he [was] again guilty of adultery .... [Regardless of whether he [was] actually guilty of adultery [this time].... ” The chancellor concluded that Andrew’s conduct in November 2008 was “misconduct of such a serious nature that it revive[d] and reinstate^] his prior adultery.” The chancellor also noted that the amount the parties agreed to for child support was below the statutory guideline amount; however, the chancellor did not make a specific ruling that the child-support obligation was insufficient.
¶ 9. Regarding the contested issues, the chancellor analyzed the factors for alimony in detail under Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993) and awarded Shannon $450 per month in rehabilitative alimony for forty-eight months. The chancellor took into account Andrew’s *164 misconduct, which had caused the breakup of the marriage. The chancellor also found Shannon was entitled to a judgment for her attorney’s fees in the amount of $5,744.40, plus interest from the entry of the judgment.
¶ 10. A final judgment of divorce was entered in November 2009, granting the parties a divorce based on irreconcilable differences. After his post-trial motions were denied, Andrew timely appealed, raising several issues relating to the grant of an irreconcilable-differences divorce, rehabilitative alimony, and child support.
STANDARD OF REVIEW
¶ 11. The standard of review in domestic-relations cases is limited. In re Dissolution of Marriage of Wood, 35 So.3d 507, 512 (¶ 8) (Miss.2010). The findings of a chancellor will not be disturbed “when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. Under the standard of review utilized to review a chancery court’s findings of fact, particularly in the areas of divorce, alimony and child support, [an appellate court] will not overturn the court on appeal unless its findings were manifestly wrong. For questions of law, our standard of review is de novo.” Id. (internal citations omitted).
ANALYSIS OF THE ISSUES
¶ 12. For judicial economy and clarity, we will combine several of Andrew’s issues in our discussion.
1. Divorce on the Ground of Irreconcilable Differences
¶ 13. Andrew argues that the chancellor should have granted him the opportunity to withdraw his consent to a divorce on the ground of irreconcilable differences because the chancellor, in effect, changed the terms of the consent divorce in his final judgment. Andrew maintains his agreement for a no-fault divorce was based on the premise that the chancery court would approve the $656 per month in child support, the parties’ distribution of the marital property, and would then consider alimony. He argues the chancellor changed the parties’ agreed-upon terms by finding the child-support obligation did not comply with the statutory guideline amount, and the deficient child-support obligation would be a factor to consider regarding alimony. He also claims the chancellor changed the irreconcilable-differences divorce to one of marital fault by making a finding of adultery in the analysis for alimony. Relatedly, Andrew raises a separate issue that he was deprived of due process of law in violation of the United States and Mississippi constitutions because he was not given notice that his agreement to an irreconcilable-differences divorce was not binding on the chancery court. Thus, he was unable to defend himself against a divorce based on adultery.
¶ 14. We find no merit to these arguments. We first note that Andrew never requested his consent to the divorce be withdrawn. Andrew is correct in noting that a divorce decree is quasi-contractual: the chancellor always has the discretion to modify the decree’s terms, and all such decrees are subject to the court’s approval. Varner v. Varner, 666 So.2d 493, 496-97 (Miss.1995) (citing Grier v. Grier, 616 So.2d 337, 340 (Miss.1993)). However, the chancellor did not modify any of the agreed-upon matters in the parties’ consent to divorce; the chancellor merely stated Andrew was at fault for the breakdown of the marriage in his analysis *165 of the Armstrong factors for alimony.[2] In doing so, the chancellor did not change the irreconcilable-differences divorce to one of fault.
¶ 15. In Driste v. Driste, 738 So.2d 763, 765-66 (¶¶ 8-9) (Miss.1999), the Mississippi Supreme Court determined a discussion of fault was proper in an Armstrong analysis, even if the divorce was based on irreconcilable differences.[3] “[Ljimited testimony regarding all the Armstrong factors can be introduced even in an uncontested divorce. However, the chancellor should exercise discretion to restrict the evidence such that the determination of relative fault for purposes of awarding alimony does not become the equivalent of trying a contested divorce.” Id. at 766(¶ 9). Interestingly, in his appellate brief, Andrew acknowledges the Driste holding but does not attempt to distinguish it.
¶ 16. In this case, the terms of the parties’ consent to divorce were not altered by the chancery court. Andrew and Shannon entered into a consent divorce on the ground of irreconcilable differences, which covered all issues of property division, child support, and responsibility for other future expenses. The chancellor then determined the amount of alimony, taking into account the child-support obligation and the evidence of Andrew’s un-condoned adultery. We find no error in this regard. The divorce was granted based on irreconcilable differences, not the chancellor’s circumstantial finding of adultery. Basically, Andrew is arguing for a withdrawal of his consent to the divorce because he was ordered to pay rehabilitative alimony. However, the chancellor did not use the evidence of Andrew’s adultery in such a way to convert the proceedings from an uncontested divorce to a fault divorce.
2. Alimony
¶ 17. Andrew argues that Shannon’s award of rehabilitative alimony was in error. He claims the chancellor misapplied the Armstrong factors which resulted in an inequitable and unjustified award of álimo-ny — an award he basically views as a “fault penalty” for his alleged adultery. Additionally, he claims Shannon was awarded alimony to compensate for the agreed-upon child-support payments, which the chancellor found insufficient under the guidelines.
 ¶ 18. “ ‘Rehabilitative periodic alimony’ is an equitable mechanism which allows a party needing assistance to become self-supporting without becoming destitute in the interim.... [It] is not intended as an equalizer between the parties but is for the purpose of allowing the less able party to start anew.” Hubbard v. Hubbard, 656 So.2d 124, 130 (Miss.1995). When deciding whether to award alimony, the chancellor must consider the Armstrong factors. Armstrong, 618 So.2d at 1280. If the chancellor applies the correct legal standard, this Court cannot reverse the chancellor’s judgment unless the chancellor manifestly erred in his findings of fact and abused his discretion. Id.
¶ 19. In this case, the parties agreed that whether or not Andrew would pay alimony to Shannon would be a contested issue left to the chancellor to decide. At trial, Shannon requested rehabilitative alimony for ten years. The chancellor properly analyzed the Armstrong factors *166 in determining whether alimony was appropriate, and he found that Andrew had a net monthly income after taxes of $4,057 per month, with expenses of $3,405.[4] The chancellor noted the amount of child support agreed to by the parties was $155.58 less than the statutory guidelines; thus, Shannon would be shouldering most of the expenses for the two children. The chancellor found Shannon needed assistance to meet her household needs, even though the chancellor thought she had overstated her monthly expenses. Her net monthly income of $1,772, plus child support of $656, would total only $2,428. She claimed total expenses of $3,374, with the court finding a more realistic monthly expense total of $2,800. Andrew has the capacity to earn approximately $115,000 per year at Clarkco, although his current take-home pay is $50,000 per year. Shannon’s take-home pay is thus $2,285 per month less than Andrew’s. Her job at Howard Industries is also the highest paying job she has held. Additionally, the chancellor noted Shannon is being treated for varicose veins, which impacts her ability to perform her manufacturing job, where she stands a great deal of the day on concrete floors.
¶ 20. The chancellor also found Andrew had spent money on many extravagances, such as a fully loaded Cadillac Escalade, a four-wheeler, guns, hunting gear, and trips to Las Vegas, Nevada, and Florida, not to mention regular visits to local casinos. Shannon, on the other hand, spent most of her paycheck on the children and household expenses. Andrew’s only debt is his Cadillac Escalade, with a balance due of $24,938. Shannon is assuming the debt on the former marital residence, which has a balance due of $6,950. She also has a vehicle loan and student loan debt, for a post-divorce debt total of $14,878.
¶ 21. The chancellor found that the former marital residence was a non-liquid asset. “[Ojccupying the property rather than selling it is worth far more than the value of the equity to Shannon,” since it is not likely she could find a similar housing situation for the same money — Shannon’s mortgage payment was $218 per month. Also, the home might not fetch the full-appraised amount, and it might take a great deal of time to sell. Thus, the chancellor found the appraised value and projected equity of the residence would be minimally considered for purposes of alimony.
¶ 22. Regarding the Armstrong factor of fault, the chancellor stated: “Andrew has been guilty of misconduct that ultimately caused the breakup of the marriage.” This finding was supported by evidence in the record of Andrew’s flirtation with another woman in the form of text messages, numerous telephone calls, and the intervention in the couple’s late-night rendezvous in June 2009 by Shannon and her private investigator. The chancellor found Andrew’s behavior made him circumstantially guilty of adultery. The chancellor concluded that even though Shannon was completing her junior college education, with the lagging economy, it may be difficult for her to earn more money; thus, she was financially challenged and needed support for an interim period. The chancellor ruled that the substantial disparity of the parties’ income, coupled with Shannon’s deficit in income and expenses, even with the division of assets, justified an award of time-limited rehabili *167 tative alimony of $450 per month for forty-eight consecutive months.
¶ 23. Andrew again takes issue with the finding of marital fault by the chancellor in his analysis of the Armstrong factors, but, as stated in the first issue, a finding of fault may be used to determine alimony. Driste, 738 So.2d at 765-66 (¶¶ 8-9). Additionally, we find no error with Andrew’s complaint of the chancellor calculating the child-support payment into his determination of alimony. When reviewing the reasonableness of an alimony award, an appellate court will “consider the totality of the chancellor’s awards upon the divorced parties, including the benefit to the payee spouse and the concomitant burden placed upon the payor spouse.” Brooks v. Brooks, 652 So.2d 1113, 1121 (Miss.1995). Moreover, the Mississippi Supreme Court has explained: “All property division, lump sum or periodic alimony payment, and mutual obligations for child support should be considered together .... to determine that they are equitable and fair.” Ferguson v. Ferguson, 639 So.2d 921, 929 (Miss.1994).
¶ 24. The chancellor thoroughly discussed each Armstrong factor in his opinion. The award of rehabilitative alimony was supported by substantial evidence in the record. The chancellor has substantial discretion in reaching a decision in matters of this nature to ensure the decision is “equitable and fair to both parties.” Seale v. Seale, 863 So.2d 996, 999 (¶ 14) (Miss Ct.App.2004). There is no indication in the record that the chancellor used the award of rehabilitative alimony to equalize the parties’ income; instead, the chancellor reasoned that the alimony award was to assist Shannon in starting anew. Accordingly, the chancellor did not abuse his discretion in awarding Shannon rehabilitative alimony.
3. Judicial Notice
¶ 25. Andrew claims that the chancellor took improper judicial notice by finding “the housing market was depressed,” but Andrew fails to relate it to any specific complaint he has regarding the chancellor’s judgment. We assume Andrew’s argument relates to the award of rehabilitative alimony, as the only place the chancellor made a comment about the housing market was during his Armstrong analysis, and there was no dispute over the award of the marital home. Andrew also complains that he could not object to this judicial notice because the chancellor did not tell Andrew that he was taking judicial notice.
¶ 26. Mississippi Rule of Evidence 201(b) explains: “A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.” Rule 201(c) explains: “A court may take judicial notice, whether requested or not.” M.R.E. 201(c).
¶ 27. In the parties’ consent to divorce, Andrew agreed that he would convey to Shannon an undivided interest in the marital home. Shannon received use of the marital home and agreed to pay the mortgage debt, which was $218 per month. At the time of trial, the debt on the marital residence was approximately $6,950. Regarding the contested issue of alimony in the Armstrong factor for the obligations and assets of the parties, the chancellor stated the following in his judgment:
On the face of it, Andrew is walking away from the divorce with little more than the proverbial shirt on his back. He gets $6,447 in assets, and Shannon gets more than ten times that amount. The asset division, however, is deceiving. *168 More than 80% of Shannon’s share of the equitable division is the equity in the former marital residence. It must be considered a non-liquidable asset on several counts. First, occupying the property rather than selling it is worth far more than the value of the equity to Shannon because it is her home and, at a mere $218 per month, could not likely be replaced for the same money. In this court’s experience, few people in this part of the world have a four-bedroom habitable residence, with seven total rooms, on one acre of land, the payment for which is only $218 per month. Second, the appraisal itself (Exhibit 12) indicates that a sale would likely fetch only 85-90% of the appraised value, and realtor and lawyer’s fees would reduce that amount even further. Third, home equity is not like cash which is immediately accessible. As Exhibit 12 states, it would probably take more than six months to sell the property, and even then, lending restrictions have tightened the pool of possible purchasers. For Shannon to sell the property would result in a temporary bulge of cash, but that cash would most likely have to be re-invested in shelter that would cost more than the current residence and result in increased living expenses. No asset has a true fair market value until it is sold. As long as the residence remains a residence, its asset value remains conjectural.
Based on the foregoing, the court finds that, for purposes of considering an award of alimony, the appraised value and projected equity of the residence should be minimally considered in this particular case.
We assume this is the passage Andrew complains of, where the chancellor took improper “judicial notice of the housing market.” However, we find no such error. The appraisal of the marital home was submitted to the chancery court at trial. The record does not indicate that the chancellor took judicial notice of a depressed housing market. The comments in the above passage are references made by the chancellor of the appraisal, and they are accurate.
4. Child Support
¶ 28. Andrew raises two issues regarding child support. First, he argues the chancellor erred in approving the consent divorce which called for child support in an amount less than the guideline amount and in adjusting this deficiency by awarding alimony. Second, Andrew claims the child-support amount stated in the consent agreement was sufficient.
¶ 29. We note that “[t]he chancery court has the authority to modify the provisions of a child support agreement in a divorce action.” Woodfin v. Woodfin, 26 So.3d 389, 399 (¶ 59) (Miss.Ct.App.2010) (citing Barton v. Barton, 790 So.2d 169, 172 (¶ 10) (Miss.2001)). Additionally, Mississippi Code Annotated section 43-19-101(2) (Rev. 2009) requires that a deviation from the statutory child-support guidelines must be supported by specific findings of fact; however, such findings are not necessary when the child-support order is based upon the parties’ agreement. Id. at (¶ 62) (citing McDonald v. McDonald, 850 So.2d 1182, 1189 (¶ 24) (Miss.Ct.App.2002)). Finally, this Court has stated that the child-support guidelines are for guidance, and the chancellor is not required to follow them mechanically. Kilgore v. Fuller, 741 So.2d 351, 354 (¶ 10) (Miss.Ct.App.1999). The guidelines should shape a decision, allowing for the needs of the child and financial ability of the parent. Id.
¶ 30. The chancellor found that Andrew *169 understated his income on his Rule 8.05[5] financial statement, and based on Andrew’s testimony, Andrew’s adjusted gross monthly income for computation of the child-support obligation was $4,057.88. Section 48-19-101(1) provides a child-support obligation of $811.58 per month, or twenty percent of $4,057.88. The amount of child support agreed upon by the parties was $656 per month, which is $155.58 per month less than the child-support guidelines section 48-19-101(1) provides. The chancellor stated: “There is nothing in the consent to support a finding that the statutory child-support guidelines are not applicable in this case. The court finds the fact that Andrew is paying less than guideline child support is a fact that the court should consider in its adjudication of the contested issues.”
¶ 31. The chancellor did not exceed his authority in approving the child-support amount below the statutory guidelines, nor does Shannon complain of the lesser amount. There was no need for the chancellor to provide specific findings of fact, as required by section 43-19-101(2), as to why the guidelines were deviated from, because the parties agreed to the child-support amount. As stated in Kil-gore, the guidelines do not need to be followed mechanically. Regardless, Andrew has no complaint about the child-support obligation being less than the statutory amount; rather, he complains it was used to justify an award of alimony. However, there are no specific findings that the chancellor awarded rehabilitative alimony to Shannon in order to compensate for a shortfall in child support; he merely explained that this fact would be considered in the contested issues. The chancellor also said at the hearing on the post-trial motion that all expenses and income were considered in his award of alimony, including child support. Further, the chancellor made detailed findings on the child-support issue, which was not required since the parties had agreed to the amount. We find no error in this regard.
¶ 32. Andrew also makes the same argument regarding child support as he did regarding the divorce and alimony: that the chancery court implicitly rejected the essence of the agreement of the parties by finding fault with Andrew’s adulterous behavior and awarding alimony. Andrew insists that the court did not accept the child-support amount, and since the court approved the consent to divorce, it should approve the child-support amount. Further, he claims if the child-support amount was inadequate, then the chancellor should have withdrawn his approval, instead of awarding alimony.
¶ 33. Again, we reiterate there is no indication the consented amount of child support was not accepted. It was. And there is no indication that the sole reason the chancellor awarded alimony to Shannon is because the child-support amount was inadequate; it was merely a fact that the court considered in regard to the totality of the parties’ financial circumstances, which is proper. See Brooks, 652 So.2d at 1121; Ferguson, 639 So.2d at 929.
¶ 34. Andrew makes two final complaints regarding the child support: the chancellor should have taken into consideration the court-ordered $200 per month he pays for the child born outside of his marriage in the adjusted gross income, and the chancellor should have taken into consideration the children’s health expenses.
¶ 35. According to section 43-19-101(3)(e), the guideline percentages are applied to the “adjusted gross income”; the court should have subtracted legally man *170 dated deductions such as court-ordered child support, among other items, to arrive at this figure. It does not appear that the chancellor deducted this $200 payment for child support, which Andrew reported on his Rule 8.05 financial statement, from Andrew’s actual gross income of $5,817.61 in order to arrive at the statutory sum of $811.58.[6] Andrew explains that if the $200 had been taken into account, the child-support guideline would have required $771.57 per month, which is less than the chancellor’s guideline amount, but higher than the agreed upon amount. However, because the chancellor accepted the agreed-upon figure of $656 for. child support, which is lower than both these other figures, it matters not whether the chancery court considered this $200 figure for Andrew’s adjusted gross income.
¶ 36. Andrew also argued that the chil-drens’ health insurance and related expenses, which he agreed to pay in the divorce consent, should have been considered when deciding the child-support obligation that was less than the guidelines. Again, because the chancellor accepted the parties’ child support figure of $656, this point is moot.
CONCLUSION
¶ 37. As the chancellor’s findings are supported by substantial evidence from the record, we affirm the chancery court’s judgment.
¶ 38. THE JUDGMENT OF THE CHANCERY COURT OF CLARKE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. RUSSELL, J„ CONCURS IN RESULT ONLY.

. This last matter was not raised on appeal by Andrew; therefore, we do not address it.

. Fault or misconduct is one of twelve Amt-strong factors. Armstrong, 618 So.2d at 1280.

. The Driste court also stated that an analysis of fault is proper in an irreconcilable-differences divorce for property distribution as well. Driste, 738 So.2d at 768 (¶ 22).

. The $3,405 figure for Andrew’s monthly expenses includes $200 for temporary alimony and $218 for the mortgage, both of which he was ordered to pay in the temporary judgment. Accordingly, the chancellor noted the final judgment will reduce his expenses by $418, thus yielding an excess of income over expenses of $1,070 per month for Andrew.

. See Uniform Chancery Court Rule 8.05.

. In his order, the chancellor only mentioned 2009 deductions totaling "$1,759.73 per month for withholding taxes, social security and Medicare.” No mention was made of another child-support obligation.